## MARTIN v. NUNEZ.

No. 1800.

Court of Appeal of Louisiana. First Circuit.

Feb. 15, 1938.

McCoy, King & Jones, of Lake Charles, and Miller & Miller, of Jennings, for appellant.

John T. Hood, Jr., of Jennings, Percy T. Ogden, of Crowley, and I. P. Saal, of Gueydan, for appellee.

LE BLANC, Judge.

This is a suit for damages for what is alleged to have been a willful and malicious assault committed by the defendant upon

the person of the plaintiff. The demand is for the sum of $10,000 and consists of three items. One for $1,000 for pain, humiliation, and suffering, one for $4,000 for permanent injury to and disfiguration of the nose, and the third, $5,000, for loss of the left eye.

The defendant for answer admits striking the plaintiff what is referred to as a mild blow, but pleads that in doing so 'he' acted in self-defense and therefore is not liable in damages. In a supplemental answer filed by him, the defendant assumes the position of a plaintiff in reconvention and asks for damages against the plaintiff in the sum of $30,000 for what he alleges to have been his unlawful and malicious acts in spreading false and defamatory words which tended to injure defendant's good name and reputation, and that in conspiracy' with his sons the plaintiff has harassed him and made threats calculated to injure and damage him. The amount of $30,000 which is demanded is made up of four items of $7,500 each, one for humiliation, one for damages to reputation, one for damages to credit and business, and the fourth for fear, mental anguish, and anxiety.

After a trial which consumed three days in taking testimony alone, the district judge rendered judgment in favor of plaintiff, holding that it had not been proven conclusively that the blow was delivered by defendant because of absolute necessity as he might have retired from the difficulty by retreating, which he was obligated to do. The district judge was not impressed very much with the seriousness of the blow as in assessing the damages he found that plaintiff had suffered none except the physical pain and suffering produced by the blow itself. There was no evidence to support the demand for damages for permanent injury to the nose or left eye and the total award was limited to the sum of $100. The defendant's claim in reconvention was rejected in toto.

The defendant appealed, but plaintiff is apparently satisfied with the judgment as rendered as not only he did not appeal, but neither did he answer the appeal taken by defendant and ask for an amendment of the judgment.

The record, as may well be surmised from the time used in taking testimony, is very voluminous. As is usual in cases of this character, most of the witnesses for the one side or the other were not without their partisan feelings and those who were free of prejudices seemed a bit reluctant about saying all they knew about the difficulty. In the actual physical encounter, one of the plaintiff's sons was a participant who also received a blow from the defendant's fist and his testimony, as well as that of his father, is in such conflict with that of the defendant that it is impossible to reconcile the different versions, especially in attempting to determine who was the actual aggressor.

From the testimony as a whole, we believe the following may be said to be the established facts up to the point to which they lead us: Lee Nunez, a brother of the defendant, owned a tract of land in Cameron parish about which he had some sort of understanding regarding a sale to Ellis Martin, a son of the plaintiff. Lee Nunez lived in Texas and his brother, the defendant herein, acted as his agent. Gabriel Martin seemed to be advising his son, Ellis, and it appears that they were both a bit slow in letting Nunez know definitely whether Ellis would buy the property or not. On the day of the fight, May 21, 1935, the plaintiff and another of his sons, Wallace Martin, had come to Lake Arthur, where the defendant lived, and on seeing them sitting on a rail in front of the moving picture theater, the defendant, who was driving on the street in his automobile, parked his car and beckoned to the elder Martin to come sit with him so that they could discuss the deal further. The testimony of the two as to what was said in the car is so radically different as to make it hard to believe either party. For instance, plaintiff says that the defendant began to speak to him "pretty rough" as soon as he got in the car and that he started to get out at once. He further states that as he opened the door, defendant caught him by the sleeve of his shirt and tore it. The defendant, on the other hand, states that he greeted the plaintiff and merely asked him what he intended doing about that land deal with his brother, and that plaintiff got mad at once and started to get out of the car. He states further that plaintiff had trouble opening the door so he leaned over and opened it so that he could get out. Of course, we see at once how utterly conflicting these two stories are and how impossible it is to ascertain if there was any overt act committed on the part of either up to this time.

After plaintiff had left the automobile, he went to join his son who was still on the

sidewalk in front of the picture show. This sidewalk is shown to be 13 feet in width. The defendant followed plaintiff on the sidewalk and whilst he says that his purpose was to continue on around the corner on a business errand, it is shown almost beyond dispute that he then and there engaged in heated words with plaintiff's son, Wallace, who apparently had become apprehensive of trouble and evidently wanted to take up the part of his father who was a much older man than the defendant, who besides was well known to be adept in the science of boxing. Wallace says that he merely told the defendant that he wanted him to respect his father, whereas the defendant says that Wallace abused and cursed him and insisted on injecting himself in the controversy in spite of his order to keep out of it. Be all that as it may, it is shown positively that it was at this moment that the defendant gave Wallace a short jab with his left hand under the chin which felled him to the sidewalk and dazed him temporarily. Plaintiff, on seeing his son knocked out, came up to lift him from the sidewalk and it was then that he also received a rather stout blow on his nose from the defendant's right-hand fist.

Considering all of the facts together, we are inclined to the opinion that the conversation which took place in the defendant's car was not as agreeable as defendant would have us believe. We think that both he and the plaintiff became a bit upset, but it is clear from the action taken by plaintiff in leaving the car that he did not care to prolong the difficulty. Had the defendant been as anxious for the matter to end there, he might also have retired instead of going into the very zone where the trouble might be resumed as in fact it was. The plaintiff's son can hardly be blamed for the attitude he took on seeing the defendant follow his father from the automobile. He doubtless assumed that there might be further difficulty and in being prepared to take the part of his father, he did only what any devoted son would do. Defendant says that Wallace cursed him, but it is a bit significant that on being twice asked to repeat the curse words, he uses a different expression in answer to each question. Besides, he is the only witness who testifies that Wallace cursed and abused him. It is our impression that the defendant, already a bit agitated, became more incensed when Wallace refused to heed his command to sit down and keep out of the controversy and used his fist when words failed to accomplish his purpose.

Defendant says that he struck the plaintiff because he had seen him open a knife which he replaced in his pocket, and was advancing toward him in a sort of crouching position. Strange again, that of the numerous witnesses who testified, defendant was the only one who saw that plaintiff had a knife. The preponderance of the testimony is that plaintiff bent over when he tried to assist in lifting his son from the sidewalk and that he made no demonstration toward the defendant which might have been taken as a threat to strike him. In further explanation why he struck the plaintiff, defendant says that he was "in a jam" with Wallace on one side of him, plaintiff in front of him, the other son, Ellis, although some distance away, still near enough to be able to take part in the fight, and his automobile in the rear. As to Ellis Martin, the testimony is clear that he was a block away from the scene of the fight and did not show up until several minutes after the defendant had left. The preponderance of proof is to the effect that after Wallace had been knocked out, defendant himself went to assist in getting him back on his feet and it was only when the plaintiff also came to help his son up that the defendant struck him. With Ellis Martin not even near and Wallace Martin knocked out, and with only the elderly Martin who is shown to be by no means able to cope physically with the defendant, present, we do not see how the latter can be said to have been in close quarters.

All in all, the testimony satisfies us that the defendant struck the plaintiff without sufficient provocation and the latter is entitled to recover such damages as he is shown to have sustained. The district judge gave valid reasons for limiting the award to the sum of $100. Plaintiff has not answered the appeal, as we have already shown, and we do not find the award seriously disputed by the defendant in case it be held that plaintiff should recover anything.

On the reconventional demand of the defendant, we find that it is based principally on the statements alleged to have been made by the plaintiff, after the fight, that he had been struck by the defendant without cause and for nothing. Inasmuch as we have reached the conclusion that there was not sufficient provocation for the blow, it follows that any statement relative

to the same could not be made the basis of a claim for damages. The defendant also predicated his claim in reconvention on threats which he alleges have caused him fear and mental anguish and anxiety. It is shown that immediately following the fight, plaintiff did ask a certain party for his gun and stated that he wanted to kill the defendant, but, as we take it, this was at a moment when he was still in the heat of passion and smarting under the humiliation which he had just undergone. The party of whom he requested the gun had none to lend him and the matter seems to have been forgotten. Proof of any other threats sufficient to produce fear or anxiety in the mind of a man physically as strong as the defendant is shown to be is lacking. We believe that the reconventional demand was properly rejected in the lower court.

For the reasons stated, the judgment appealed from is affirmed at the costs of the appellant.